UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHARMASTEM THERAPEUTICS, INC., a Delaware corporation,<br><br>            Plaintiff,<br><br>    v.<br><br>VIACELL, INC., a Delaware corporation, OBSTETRICAL AND GYNECOLOGICAL ASSOCIATES, P.A., FEMPARTNERS, INC., a Delaware corporation and CARITAS ST. ELIZABETH'S MEDICAL CENTER OF BOSTON, INC., a Massachusetts Nonprofit Corporation,<br><br>            Defendants. | Civil Action No. 04-CV-11673 RWZ |

**EXHIBIT 6**

**TO**

**DECLARATION OF ATTORNEY EDWARD W. LITTLE, JR.**

Link to Original WordPerfect Document

___

**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
_____
                              :
SCHWARZ PHARMA, INC., SCHWARZ :
PHARMA AG and WARNER-LAMBERT  :
COMPANY,                      :
                              :
        Plaintiffs,           :
                              :
   -against-                  :   Civ. No. 01-4995 (DRD)
                              :
                              :
TEVA PHARMACEUTICALS, U.S.A.  :   O P I N I O N
                              :
        Defendant.            :
_____:
```

Michael C. Clarke, Esq.
Drinker, Biddle & Shanley LLP
500 Campus Drive
Florham Park, NJ 07932

Robert L. Baechtold, Esq.
Nicholas M. Camnella, Esq.
Joseph M. O'Malley, Jr.
Fitzpatrick, Cella, Harper & Scinto
30 Rockefeller Plaza
New York, NY 10112
    Attorneys for Plaintiff/Counterclaim Defendants, Warner- Lambert Company

Charles M. Lizza, Esq.
Michael T. Carton, Esq.
LeBoeuf, Lamb, Greene & Macrae LLP
One Riverfront Plaza
Newark, NJ 07102-5490

Brian M. Poissant, Esq.
F. Dominic Cerrito, Esq.
John D. Garretson, Esq.
Pennie & Edmonds LLP
1155 Avenue of the Americas
New York, NY 10036-2711
    Attorneys for Plaintiffs/Counterclaim Defendants, Schwarz Pharma, Inc. and Schwarz Pharma AG

Arnold B. Calmann, Esq.

---

Lauren Kende, Esq.
Saiber Schlesinger Satz & Goldstein, LLC
One Gateway Center, 13th Floor
Newark, NJ 07102-5311

Kenneth A. Cohen, P.C.
Thomas L. Creel, P.C.
Goodwin Procter, LLP
Exchange Place
Boston, MA 02109

W. Edward Bailey, Esq.
A. Joy Arnold, Esq.
Fish & Neave
1251 Avenue of the Americas
New York, NY 10020
    Attorneys for Defendant/Counterclaim Plaintiff, Teva Pharmaceuticals USA

**DEBEVOISE, Senior District Judge**
    This is a patent infringement action which plaintiffs, Schwarz Pharma, Inc. and Schwarz Pharma AG (collectively, "Schwarz Pharma") and Warner-Lambert Company ("Warner-Lambert") instituted against defendant Teva Pharmaceuticals, U.S.A. ("Teva"). Teva filed a counterclaim against Schwarz Pharma and Warner-Lambert (sometimes referred to collectively as "Plaintiffs").
    Warner-Lambert has moved to dismiss Teva's antitrust counterclaims (counterclaims II, III and IV) pursuant to Fed.R.Civ.P. 12(b)(6) for failure to define a relevant product market. In the alternative, Warner-Lambert moves under Fed.R.Civ.P. 12(f) to strike Teva's antitrust and unfair competition counterclaims (II, III and V) "to the extent they include allegations concerning Warner-Lambert's prosecution of the separate, earlier-filed quinapril lawsuit." (Mem. in Supp. of Warner-Lambert's Motion to Dismiss and Strike ("Warner-Lambert Br.") at 1.) Warner-Lambert also seeks to dismiss Teva's patent misuse counterclaim (VI) and strike Teva's third affirmative defense of misuse. Relying on Warner-Lambert's Brief, Schwarz Pharma filed a similar motion, pursuant to Fed.R.Civ.P. 12(c), to dismiss Teva's counterclaims II, III, IV and VI and to dismiss Teva's affirmative defense based on misuse.
    For the reasons set forth below, the plaintiffs' motion to dismiss counterclaims II through IV pursuant to Fed.R.Civ.P. 12(b)(6) for failure to define a relevant product market under the antitrust laws is denied. In addition, Warner-Lambert's motion under Fed.R.Civ.P. 12(f) to strike various allegations against it in Teva's antitrust and unfair competition counterclaims (II, III and V) is granted. Plaintiffs' motion to dismiss Teva's third affirmative defense and sixth counterclaim is denied.
**Background**
**A. The Quinapril Lawsuit**
    More than three years ago, Warner-Lambert filed a complaint against Teva (the "quinapril lawsuit"), <u>Warner-Lambert Co. v. Teva Pharmaceuticals USA</u>, Civ. No. 99-922, alleging that a drug that Teva produced infringed upon a Warner-Lambert patent (the "'450 patent"). In its answer, Teva admitted to infringing Warner-Lambert's '450 patent, but asserted defenses of: (1) patent invalidity, and (2) unclean hands, based on Warner-Lambert allegedly asserting its "invalid" patent. (Ans. at ¶¶ 7, 14-18.)
    On May 6, 1999, a scheduling order was entered in the quinapril lawsuit. The scheduling order set a deadline of October 12, 1999 for any motion to amend a pleading. (Dec. of F. Christopher Mizzo, Exh. 3, at ¶ 5 (hereinafter, "Mizzo Dec.").) On October 12, 1999, Teva filed its Amended Answer. The Amended Answer denied infringement and added the defense of unenforceability based on Warner-Lambert's alleged inequitable conduct before the United States Patent and Trademark Office ("PTO").

(Am. Ans. ¶ 19, 21-29.) Teva's unenforceability defense alleged that Warner-Lambert "did not disclose" or "misrepresented the state of" various prior art, including a "Renitec monograph" and Merck's Vasotec product. (Id. at ¶ 22, 24 & 28.) Teva did not assert any counterclaims in either its Answer or Amended Answer.

**B. The Moexipril Suit**

On October 26, 2001, Schwarz Pharma filed a complaint alleging that Teva infringed the '450 patent. Schwarz Pharma AG and Schwarz Pharma, Inc., the exclusive licensee and sublicensee of the '450 patent respectively, exercising their alleged contractual rights, also named Warner-Lambert as a co-plaintiff (the "moexipril suit").See footnote 1[1] On December 28, 2001, Teva filed its Answer and Counterclaims, which Teva amended on February 7, 2002.

Teva asserts four affirmative defenses and six counterclaims in its Amended Answer and Counterclaims. The third affirmative defense and the second through sixth counterclaims are the subject of Warner-Lambert's motion to dismiss. The third affirmative defense alleges that Schwarz Pharma and Warner- Lambert brought the instant suit to enforce a patent that both Plaintiffs knew or should have known is invalid, unenforceable and not infringed, and therefore both Plaintiffs have failed to bring the instant suit in good faith and both have "unclean hands." Counterclaim II alleges that Warner-Lambert, by itself and in conjunction with Schwarz Pharma, violated § 2 of the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. § 2, through monopolization. Counterclaim III alleges that Warner-Lambert, by itself and in conjunction with Schwarz Pharma, violated § 2 of the Sherman Act, 15 U.S.C. § 2, through attempted monopolization of certain markets. Counterclaim IV alleges that Warner-Lambert violated § 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to restrain trade in certain markets. Counterclaim V alleges that Warner-Lambert engaged in unfair competition. Counterclaim VI alleges that Warner-Lambert and Schwarz Pharma committed patent misuse by improperly asserting rights under the patent laws to secure an exclusive right or monopoly to which they are not entitled and which is contrary to public policy.

Teva's antitrust counterclaims (II-IV) all rely on the same definition of the relevant product markets. (Id. at ¶¶ 53, 54, 74, 79.) Specifically, Teva alleges that there are three different relevant product markets located in the United States: (1) compositions containing angiotensin converting enzyme inhibitors ("ACE inhibitors") for treating hypertension (the "ACE inhibitors product market"); (2) compositions containing moexipril for treating hypertension (the "moexipril product market"); and (3) compositions containing quinapril for treating hypertension (the "quinapril product market"). (Id. at ¶¶ 53-54.)

The gravamen of the antitrust and unfair competition counterclaims (II, III, IV and V) is that Teva has been wrongfully restrained from competing with its generic moexipril and quinapril products through a pattern of wrongful conduct including: (1) the wrongful prosecution and maintenance of the '450 patent application and fraud on the PTO through intentional misrepresentations and omissions; (2) contracts between the Plaintiffs and possibly with others which allowed this pattern of conduct to be implemented; (3) a conspiracy between the plaintiffs themselves and possibly with others to exclude TEVA from bringing either a generic quinapril or a generic moexipril product for the treatment of hypertension to the market, despite the fact that plaintiffs have taken inconsistent positions in order to allege that the '450 patent covers both products and is valid and enforceable; and (4) the institution and maintenance of objectively baseless sham litigation to exclude competition, including both the litigation against Teva in this case and the litigation brought by Warner-Lambert to prevent FDA approval of a different TEVA accelerated new drug application ("ANDA") relating to quinapril, purporting to rely on the '450 patent. (Am. Ans. ¶ 60.) According to Teva, these actions violate the antitrust laws as developed by the case law in Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 175-76 (1965) (recognizing an antitrust cause of action for enforcement of a fraudulently obtained patent), Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144 (1961) (recognizing antitrust cause of action for suits that are "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor"), and their progeny.

Warner-Lambert now moves pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss counterclaims II-IV set forth in Teva's Amended Answer and Counterclaims for failure to state a claim upon which relief can be granted because Teva has failed to define a relevant product market over which Warner-Lambert has monopolized or attempted to monopolize. Schwarz Pharma has separately moved to join Warner-Lambert's motion to dismiss under Fed.R.Civ.P. 12(c). Warner-Lambert also moves, in the alternative, to strike portions of counterclaims, II, III and V in accordance with Fed.R.Civ.P. 12(f) because it contends that portions of those counterclaims were compulsory counterclaims that Teva should have asserted in the earlier quinapril lawsuit. Warner-Lambert also moves to dismiss counterclaim VI and Teva's third affirmative defense for legal insufficiency because it contends that allegations of sham litigation can never constitute patent misuse.

## Dismissal Standards

The standard under which the Court must analyze the plaintiff's complaint and the defendant's arguments in a Rule 12(c) motion for judgment on the pleadings is the same as the standard applied on a motion to dismiss under Fed.R.Civ.P. 12(b)(6). See Fed.R.Civ.P. 12(h)(2); see also Turbe v. Government of the Virgin Islands, 938 F.2d 427, 428 (3d Cir.1991); Institute for Scientific Info., Inc. v. Gordon & Breach, Science Publishers, Inc., 931 F.2d 1002, 1006 (3d Cir. 1991). Pursuant to Rule 12(b)(6), a claim embodied in a complaint or counterclaim must be dismissed for failure to state a claim if the opposing party demonstrates "beyond a doubt that [the claimant] can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see In re Craftmatic Sec. Litig., 890 F.2d 628, 634 (3d Cir. 1989); Johnsrud v. Carter, 620 F.2d 29, 33 (3d Cir. 1980). All allegations set forth in the complaint must be accepted as true, see Cruz v. Beto, 405 U.S. 319, 322 (1972), and all reasonable inferences must be drawn in the claimant's favor. See Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir. 1991). On a Rule 12(b)(6) motion, the district court is limited to the facts alleged in the complaint or counterclaim, not those raised for the first time by counsel in its legal memorandum. See Seevers v. Arkenberg, 726 F. Supp. 1159, 1165 (S.D. Ind. 1989); Hauptmann v. Wilentz, 570 F. Supp. 351, 364 (D.N.J. 1983). Nevertheless, the court may also consider the exhibits attached to a complaint and documents referenced by the Complaint. See Chester County Intermediate Unit v. Pennsylvania Blue Shield, 896 F.2d 808, 812 (3d Cir. 1990); cf. Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1996 (3d Cir. 1993) (stating that a "court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss," without converting the motion into a motion for summary judgment, "if the plaintiff's claims are based on the document").

Rule 12(f) exists as a means for testing the legal sufficiency of a defense. It provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). Rule 12(f) motions are generally disfavored because "they require the court to evaluate legal issues before the factual background of a case has been developed through discovery." F.D.I.C. v. White, 828 F. Supp. 304, 307 (D.N.J.1993) (citing Cippolone v. Liggett Group, Inc., 789 F.2d 181, 188 (3d Cir. 1986)); United States v. 416.81 Acres of Land, 514 F.2d 627, 631 (7th Cir. 1975); Glenside West Corp. v. Exxon Corp., 761 F. Supp. 1100, 1115 (D.N.J.1991). Although a motion to strike should only be granted "when a defense is legally insufficient under any set of facts which may be inferred from the allegations of the pleading," Glenside, 761 F. Supp. at 1115, in such cases it properly serves to avoid unnecessary discovery and thereby streamlines the process of litigation. See White, 828 F. Supp. at 307; Glenside, 761 F. Supp. at 1115.

## Analysis

### A. Whether Teva Failed to Define a Relevant Product Market

Warner-Lambert and Schwarz Pharma both assert that Teva has failed to define a relevant product market. In this circuit, to sustain a claim under § 1 of the Sherman Act, "the plaintiff must show: (1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that

the plaintiff was injured as a proximate result of that conspiracy." Fleer Corp. v. Topps Chewing Gum, Inc. 658 F.2d 139, 147 (3d Cir. 1981). To establish a monopolization claim under § 2 of the Sherman Act, a plaintiff must show: "(1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident." See Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 596 (1985) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)). To establish a § 2 attempted monopolization claim, a plaintiff must prove (1) that the defendant engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. See Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993). To determine whether there is a dangerous probability of achieving monopoly power, it is necessary for the court to define the relevant product market. See id. Thus, to establish any claim under either section 1 or 2 of the Sherman Act, Teva must define a relevant product market.

In Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 437 (3d Cir. 1997), the Court of Appeals for the Third Circuit stated that the outer boundaries of a relevant product market are determined by reasonable interchangeability of use. See also Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 482 (1992) (stating same); United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956) (stating that test for relevant market is "commodities reasonably interchangeable by consumers for the same purposes"). "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively. A person needing transportation to work could accordingly buy a Ford or a Chevrolet automobile, or could elect to ride a horse or bicycle, assuming those options were feasible." Allen-Myland, Inc. v. International Business Machines, Corp., 33 F.3d 194, 206 (3d Cir. 1994) (internal quotations omitted). When assessing reasonable interchangeability, "[f]actors to be considered include price, use, and qualities." Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991). Reasonable interchangeability is also indicated by "cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). In other words, products in a relevant market are characterized by a cross-elasticity of demand when "the rise in the price of a good within a relevant market would tend to create a greater demand for other like goods in that market." Tunis Bros., 952 F.2d at 722.

Plaintiffs contend that Teva has failed to define the relevant market over which the Plaintiffs have allegedly exerted control or attempted to exert control. According to Plaintiffs, Teva should have detailed the interchangeability and cross-elasticity of demand of ACE inhibitors, moexipril and quinapril. Without these details, Plaintiffs assert that Teva has failed to plead and establish properly the prerequisite elements of an antitrust claim.

Although a district court may insist upon some specificity in the pleadings of an antitrust case before allowing a potentially massive factual controversy to proceed, see Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 526 n. 17 (1983), here it is unnecessary. In its counterclaims, Teva states that there are three distinct relevant product markets: the ACE inhibitor product market; the quinapril product market; and the moexipril product market. (Am. Ans. ¶¶ 53-54.) By defining each market in terms of a single product, Teva in effect is alleging that there are no other products that are reasonably interchangeable with them. Whether this is correct must be determined after development of the facts. Teva defines the geographic boundaries of each product market as the United States. By naming each of the relevant product markets and their geographic loci, Teva has satisfied the pleading requirement of Rule 8(a) of the Federal Rules of Civil Procedure, which only requires that a claimant plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Unlike securities fraud claims asserted under section 10(b) of the Exchange Act of 1934, there is no heightened pleading standard in antitrust cases, and the general principles governing Rule 12(b)(6) motions apply. See In re Mercedes-Benz Anti-Trust Litigation, 157 F. Supp. 2d 355, 359 (D.N.J. 2001); see also MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc., 62 F.3d 967, 976 (7th Cir. 1995) (holding same).

The Plaintiffs rely heavily on Queen City in support of their contention that Teva has failed to

properly plead a relevant product market. The Queen City court, however, noted that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." Queen City, 124 F.3d at 436 (quoting Kodak, 504 U.S. at 482). Furthermore, the facts of Queen City are clearly distinguishable from those in the instant action. In Queen City, both the District Court and the Court of Appeals determined that the plaintiff's definition of the relevant market subject to antitrust scrutiny-- "ingredients, supplies, materials and distribution services used by and in the operation of Domino's pizza stores"--was deficient because the alleged relevant product market was artificially created by a franchise agreement made between the parties and because there were obviously interchangeable products that plaintiff failed to include in its definition of relevant product market. See footnote 2[2] Id. at 438.

The counterclaims in the instant action, however, do not suffer from a similar flaw. Here, without additional factual inquiry that could only be provided through expert testimony, it is not readily apparent from the face of the counterclaims that Teva has failed to define relevant product markets. See Conley, 355 U.S. at 45-46 (stating that a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). Consequently, Plaintiffs' motion to dismiss the antitrust claims for failure to plead a relevant market is denied.

**B.   Whether Teva's Counterclaims II, III and V Were Compulsory Counterclaims that Should Have Been Asserted in the Quinapril Lawsuit**

Warner-Lambert notes the quinapril-related Walker Process and sham litigation claims are related to the quinapril lawsuit and contends, therefore, that under Rule 13(a), they should be stricken from the instant case under Fed.R.Civ.P. 12(f). See Bristol-Myers Squibb Co. v. Ivax Corp., 77 F. Supp.2d 606, 619-20 (D.N.J. 2000) (striking portions of counterclaims which were compulsory). Further, Warner-Lambert argues that under C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340 (Fed. Cir. 1998), cert. denied, 526 U.S. 1130 (1999), sham litigation and Walker Process claims only give rise to antitrust claims -- not patent misuse.

A counterclaim is compulsory if the claim: (1) exists at the time of pleading, (2) arises out of the "transaction or occurrence that is the subject matter of the opposing party's claim," and (3) "does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." Fed.R.Civ.P. 13(a). A claim arises out of the same transaction or occurrence if it is "logically related." Great Lakes Rubber Corp. v. Herbert Cooper Co., 286 F.2d 631, 634 (3d Cir. 1961). A claim is logically related if it involves: "(1) many of the same factual issues; (2) the same factual and legal issues; or (3) offshoots of the same basic controversy between the parties." Xerox Corp. v. SCM Corp., 576 F.2d 1057, 1059 (3d Cir. 1978).

Here, Warner-Lambert asserts that the Walker Process and sham litigation claims and the factual issues involved in developing these claims are so closely related to the quinapril lawsuit that they must be considered compulsory and therefore should have been raised in the earlier quinapril lawsuit. Teva contends, however, that although the antitrust counterclaims may be classified as compulsory under Fed.R.Civ.P. 13(a), the Supreme Court has crafted an exception to Rule 13(a) in the case of Mercoid Corporation v. Mid-Continent Investment Co., 320 U.S. 661, 669-72 (1943), where it allowed the defendant to assert a tying antitrust counterclaim notwithstanding the fact that the counterclaim was not raised in an earlier patent infringement litigation. The Supreme Court's holding in Mercoid has been narrowly interpreted in subsequent cases. See, e.g., Critical-Vac Filtration Corp. v. Minuteman Int'l, Inc., 233 F.3d 697, 702 (2d Cir. 2000); Rohm & Haas Co. v. Brotech Corp., 770 F. Supp. 928, 933 (D. Del. 1991). The Second Circuit Court of Appeals's interpretation of Mercoid in Critical-Vac and a similar interpretation by district courts in the Third Circuit appear reasonable. Applying their reasoning, Teva's antitrust and misuse counterclaims will be deemed compulsory rather than permissive. See footnote 3[3]

In Mercoid, the Court allowed the defendant in a patent infringement lawsuit, Mercoid Corporation

("Mercoid"), to raise an antitrust counterclaim that it had failed to raise in a prior patent infringement lawsuit brought by the same plaintiff, the Mid-Continent Investment Corporation ("Mid-Continent") and in which Mercoid provided the defense. Mid-Continent was the holder of a patent for a domestic heating system composed of a furnace and a separate thermostatic control device, which included a combustion stoker (the "Cross patent"). See Mercoid, 320 U.S. at 663. However, not all of the individual elements of the Cross patent, such as the combustion stoker, were patented. See id.

In the earlier proceeding, Mid-Continent had sued Smith, a Mercoid customer, for patent infringement as a result of his installation of a heating system in his home that used a combustion stoker device manufactured by Mercoid, but otherwise relied upon the Cross patent. See Mid-Continent Inv. Co. v. Smith, 35 U.S.P.Q. 204 (W.D. Mo. 1937). Mercoid was not a party to the lawsuit but directed and paid for its customer's unsuccessful defense. See Mid-Continent Inv. Co. v. Mercoid Corp., 43 F. Supp. 692, 693 (N.D. Ill. 1942). After prevailing against Smith and subsequently failing to negotiate a licensing agreement with Mercoid for installing thermostatic control devices in other homes, Mid-Continent filed a patent infringement suit against Mercoid. See id. at 694-95. Mercoid responded with an antitrust counterclaim challenging Mid-Continent's licensing practices and seeking damages under the Sherman Act. See id.

Mercoid prevailed in the district court but lost on appeal. See Mercoid, 320 U.S. at 662-63. The Supreme Court reversed. See id. at 661. Justice Douglas, writing for a 5-4 majority, noted that "[t]he grant of a patent is the grant of a special privilege," id. at 665, and that Mid-Continent's actions were "a graphic illustration of the evils of an expansion of the patent monopoly by private engagements," id. at 666. Reasoning that Mid-Continent's patent covered only the heating system, not its individual components, Justice Douglas explained that Mid- Continent's misuse of its patent "for the purpose of monopolizing unpatented material," in essence an antitrust tying claim, barred relief against Mercoid. Id. at 668.

Justice Douglas rejected Mid-Continent's argument that res judicata barred Mercoid's defenses and counterclaims for damages. That argument, he reasoned, would place the Court's "imprimatur on a scheme which involves a misuse of the patent privilege and a violation of the antitrust laws. It would aid in the consummation of a conspiracy to expand a patent beyond its legitimate scope." Id. at 670. Turning specifically to Mercoid's counterclaim, Justice Douglas wrote:

> Though Mercoid were barred in the present case from asserting any defense which might have been interposed in the earlier litigation, it would not follow that its counterclaim for damages would likewise be barred. That claim for damages is more than a defense; it is a separate statutory cause of action. The fact that it might have been asserted as a counterclaim in the prior suit by reason of Rule 13(b) of the Rules of Civil Procedure does not mean that the failure to do so renders the prior judgment res judicata as respects it. . . . The case is then governed by the principle that where the second cause of action between the parties is upon a different claim the prior judgment is res judicata not as to issues which might have been tendered but "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered."

Id. at 671. Concluding that the previous lawsuit had resolved different "matters in issue or points controverted" than those involved in the dispute before it, the Court held that the principles of res judicata did not bar Mercoid's antitrust counterclaim for damages. Id.

By applying the permissive counterclaim rule, Fed.R.Civ.P. 13(b), to an antitrust claim arising out of the same transaction or occurrence as earlier patent infringement litigation between the same parties, Mercoid created an exception to the more stringent requirements of Fed.R.Civ.P. 13(a). The Supreme Court, however, has never articulated a clear explanation of why it elected to consider Mercoid's counterclaim permissive instead of compulsory or whether all antitrust counterclaims are permissive. As a consequence, many lower courts have limited the Mercoid exception to the facts of the case.

In Critical-Vac, the Court of Appeals for the Second Circuit was confronted with the issue of whether an antitrust counterclaim asserted by the defendant was a compulsory counterclaim that should have been asserted in an earlier lawsuit. The Court addressed the issue by distinguishing between claims

of patent <u>misuse</u> and claims of patent <u>invalidity</u>. Applying this distinction to <u>Mercoid</u>, the Court noted that Mercoid's antitrust counterclaim was based on Mid-Continent's misuse of a validly issued patent by tying the purchase of an unpatented product to the purchase of a patented product over which Mid-Continent had a monopoly. In contrast, the facts of <u>Critical-Vac</u> were of a patentee obtaining an invalid reissue patent and then instituting a patent infringement litigation to enforce the invalid patent. See <u>Critical-Vac</u>, 233 F.3d at 703. The Court reasoned that "although the <u>Mercoid</u> court did not explain why the 'evil' at issue in that case _ the misuse of a valid patent _ should render permissive an otherwise compulsory counterclaim, it was nevertheless that particular 'evil,' and <u>not</u> the attempted enforcement of an invalid patent that the Court sought to address by carving out an exception to Rule 13(a)." <u>Id.</u> Thus, <u>Critical-Vac</u> held that the <u>Mercoid</u> exception to Rule 13(a) does not apply to antitrust claims that raise the issue of patent validity because these are logically connected to the issue of patent infringement. See <u>id.</u> at 704.

    In further support of its ruling that only antitrust counterclaims based on patent misuse are not compulsory, the Court noted that antitrust claims based on patent misuse, such as the counterclaims in <u>Mercoid</u>, are likely to involve factual issues distinct from those involved in patent infringement litigation between the same parties. Accord <u>Mercoid</u>, 320 U.S. at 671 (noting that Mercoid's counterclaims involved different "matters in issue or controverted" from those involved in the earlier patent infringement litigation). In contrast, antitrust claims based on patent invalidity because of fraud or inequitable conduct, such as the case <u>sub judice</u>, will generally involve the same factual issues as those involved in the patent infringement litigation between the same parties. Consequently, an exception to Rule 13(a) for at least some antitrust counterclaims in patent infringement actions will be consistent with the purpose of Rule 13(a) _ the resolution of all "logically connected" claims between the same parties in the same proceeding _ whereas a per se exception to Rule 13(a) for antitrust counterclaims in patent infringement suits would often contradict the purpose of that rule. This is a practical interpretation of <u>Mercoid</u>'s holding that also adheres to the underlying principles of the Federal Rules of Civil Procedure. Thus it is reasonable to adopt the Second Circuit Court of Appeals's interpretation of <u>Mercoid</u>.

    In the instant case, Teva has alleged antitrust counterclaims against Warner-Lambert based on <u>Walker Process</u> allegations and sham litigation allegations, charging monopolization and attempted monopolization of the quinapril product market. See footnote 4[4] In <u>Walker Process</u>, the Court established that antitrust liability under section 2 of the Sherman Act may arise when: (1) a patent has been procured by knowing and willful fraud; (2) the patentee has market power in the relevant market; and (3) the patentee has used its fraudulently obtained patent to restrain competition. See 382 U.S. at 175-76. Thus, Teva's <u>Walker Process</u> claim requires proof of facts that are logically related to proof of patent invalidity, which was a defense raised in Teva's Amended Answer in the quinapril lawsuit. (Mizzo Dec., Ex. 4, at ¶¶ 22-30.) Because the facts supporting Teva's <u>Walker Process</u> counterclaim existed when it filed its Amended Answer in the quinapril lawsuit, the counterclaim is logically related to the legal issues raised in the quinapril lawsuit, i.e., the validity of the '405 patent. Pursuit of that claim in the quinapril lawsuit did not "require for its adjudication the presence of third parties." Teva's <u>Walker Process</u> claim against Warner-Lambert was, therefore, a compulsory counterclaim that should have been asserted in the quinapril lawsuit.

    To prevail on a sham litigation claim, a claimant must show that the suit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and is subjectively motivated by a desire to impose collateral, anti-competitive injury rather than to obtain a justifiable legal remedy. Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 60-61 (1993) ("<u>PRE</u>"); <u>see also</u> Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1072 (Fed. Cir. 1998) ("[A] sham suit must be both subjectively brought in bad faith and based on a theory of either infringement or validity that is objectively baseless."). Applying Fed.R.Civ.P. 13(a), it is evident that by the time Teva filed its Amended Answer in the quinapril lawsuit, it should have been able to determine whether it could assert a sham litigation counterclaim against Warner-Lambert with respect to its alleged monopolization and attempted monopolization of the quinapril product market. Teva's sham litigation allegations are directly related to and are dependant upon the merits of the issues in the quinapril lawsuit

and do not require for their adjudication the presence of third parties. Consequently, like Teva's Walker Process allegations, Teva's sham litigation allegations regarding Warner-Lambert's alleged monopolization and attempted monopolization of the quinapril product market in the instant action should have been asserted in the quinapril lawsuit as compulsory counterclaims.

Teva's fifth counterclaim, alleging that Warner-Lambert engaged in unfair competition in connection with the quinapril lawsuit, depends upon allegations that were compulsory in nature and should have been asserted against Warner-Lambert in the quinapril lawsuit. Teva's unfair competition counterclaim against Warner-Lambert existed when Teva filed its Amended Answer in the quinapril lawsuit; its unfair competition counterclaim is logically related to Warner-Lambert's claims of patent infringement; and its counterclaim did not require for its adjudication the presence of third parties. Therefore, Teva's unfair competition counterclaim against Warner-Lambert was a compulsory counterclaim that should have been asserted in the quinapril lawsuit.

Thus in the instant case, Teva has asserted against Warner-Lambert antitrust counterclaims (II and III) and an unfair competition counterclaim (V) which are based on allegations of Walker Process and sham litigation violations that should have been asserted as compulsory counterclaims in the quinapril lawsuit. The relief that Warner-Lambert seeks is an order striking from Counterclaims II, III and V and from Teva's related patent misuse affirmative defense allegations concerning Warner-Lambert's prosecution of the quinapril lawsuit. Thus relief is appropriate under the circumstances, and it can be determined at a later date whether anything remains of these counterclaims and affirmative defense as against Warner-Lambert.

## C. Whether Teva's Patent Misuse Counterclaim is Legally Insufficient Under Federal Circuit Precedent

The Federal Circuit Court of Appeals has held that the "defense of patent misuse arises from the equitable doctrine of unclean hands, and relates generally to the use of patent rights to obtain or to coerce an unfair commercial advantage." C.R. Bard, Inc. v. M3 Systems, Inc., 157 F.3d 1340, 1372 (Fed. Cir. 1998). Patent misuse relates primarily to a patentee's actions that affect competition in unpatented goods or that otherwise extend the economic effect beyond the scope of the patent grant. See id. (citing Mallinckrodt, Inc. v. Medipart, Inc., 976 F.2d 700, 703-04 (Fed. Cir. 1992)). Patent misuse is viewed as a broader wrong than an antitrust violation because of the economic power that may be derived from the patentee's right to exclude. Consequently, misuse may arise when the conditions of an antitrust violation are not met. See id. According to the Federal Circuit Court of Appeals, "[t]he key inquiry is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect." See id.

Warner-Lambert and Schwarz Pharma both maintain that Teva's sixth counterclaim and third affirmative defense alleging patent misuse must be dismissed because sham litigation claims and Walker Process claims are not within the ambit of patent misuse. In support of this proposition, Plaintiffs rely upon Bard. Teva contests this assertion and also relies on Bard to support its position.

The Bard court's decision overturned a trial court's jury instructions regarding patent misuse. According to the Court, the trial court's jury instructions regarding what acts constituted "wrongful" misuse were too vague, noting that "[a]lthough the law should not condone wrongful commercial activity, the body of misuse law and precedent need not be enlarged into an open-ended pitfall for patent-supported commerce." Id. at 1373. The Court, however, neither stated nor implied that sham litigation would not constitute a type of patent misuse, though it did note that the defendant did not propose any of the "classic grounds of patent misuse," such as tying or enforced package licensing or price restraints. Instead, it merely held that "[t]here was no evidence that Bard's competitive activities were either per se patent misuse or that they were not "reasonably" within the patent grant." Id.

Consequently, although Teva has not pled any facts that would be considered patent misuse per se or "classic grounds of patent misuse," it is possible that Teva may be able to demonstrate some set of facts going beyond Warner-Lambert's prosecution of the quinapril lawsuit that would demonstrate an instance of patent misuse. At this stage in the litigation, it is inappropriate to dismiss Teva's misuse

counterclaim or affirmative defense.

## CONCLUSION

For the reasons set forth above, Warner-Lambert's and Schwarz Pharma's motion to dismiss Teva's antitrust counterclaims for failure to define a relevant product market is denied. Warner-Lambert's motion to strike from antitrust counterclaims II and III, from the unfair competition counterclaim V and from Teva's third separate affirmative defense allegations concerning Warner-Lambert's prosecution of the quinapril lawsuit will be granted. Warner-Lambert's motion to dismiss Teva's patent misuse counterclaim VI and to strike Teva's third affirmative defense in its entirety will be denied. Schwarz Pharma's motion for judgment on the pleadings with respect to the antitrust counterclaims II, III and IV and with respect to the patent misuse counterclaim VI will be denied. Schwarz-Pharma's motion for dismissal of Teva's third affirmative defense will be denied. An appropriate order shall follow.

DICKINSON R. DEBEVOISE, U.S.S.D.J.

DATED: June , 2002

---

*Footnote: 1* *¹Schwarz Pharma named Warner-Lambert as a co-plaintiff in the moexipril suit despite Warner-Lambert's stated belief that there was, and continues to be, no viable claim of patent infringement. (Warner- Lambert's Reply to Counterclaims ¶ 37(18).) Despite Schwarz Pharma's and Warner-Lambert's apparently adversarial positions, Warner-Lambert must be joined as an indispensable party to this litigation. See Abbot Laboratories v. Diamedix Corp., 47 F.3d 1128, 1133 (Fed. Cir. 1995) (holding that to create standing, "a patentee that does not voluntarily join an action prosecuted by its exclusive licensee can be joined as a defendant or . . . made an involuntary plaintiff if it is not subject to service of process").*

*Footnote: 2* *²Similarly, Plaintiffs' reliance on the holding of Syncsort Inc. v. Sequential Software, Inc., 50 F. Supp.2d 318, 333 (D.N.J. 1999), fails to support their contention that Teva has failed to define a relevant product market. As in Queen City, it was readily apparent from the pleadings that the counterclaimant "ignored the broader sorting market" and that it failed to "explain the rationale underlying its narrow proposed market definition." See id. at 332-33.*

*Footnote: 3* *³The Courts of Appeals in the Fifth and Ninth Circuits interpret Mercoid more broadly, holding that the Supreme Court created an exception to Rule 13(a) for antitrust counterclaims in which the gravamen is the patent infringement lawsuit initiated by the counterclaim defendant. See Tank Insulation Int'l, Inc. v. Insultherm, Inc., 104 F.3d 83, 86-87 (5th Cir. 1997); Hydranautics v. Filmtec Corp., 70 F.3d 533, 536 (9th Cir. 1995). Critical-Vac and the line of cases that follow it are in accord with sound principles of judicial economy without doing violence to Mercoid's holding.*

*Footnote: 4* *⁴ Because this is a suit initiated by Schwarz Pharma and Schwarz Pharma is not a party to the quinapril lawsuit, Teva's antitrust counterclaims against Schwarz Pharma are not barred by Fed.R.Civ.P. 13.*

---

This archive is a service of Rutgers University School of Law - Camden